**HOAGLAND LONGO MORAN, DUNST & DOUKAS, LLP**

**ATTORNEYS at LAW**

40 Paterson Street
New Brunswick, NJ 08901
Tel: (732) 545-4717   Fax: (732) 545-4579
www.hoaglandlongo.com

Sean O'Connor
Partner
so'connor@hoaglandlongo.com

April 19, 2010

Chief Judge Garrett E. Brown, Jr.
United States District Court
Federal Building and U.S. Courthouse, Room 4050
Trenton, NJ 08608
E-FILED (COURTESY COPY TO FOLLOW)

      **Re:**   **Boswell, Michael v. City of New Brunswick**
           Our File No.:  5534778 - SO
           Claim No. (MCMJIF, Claims Office):      15193-01
           Claim No. (Meadow Brook Insurance Group):     #3AYGL0600541
           Docket No.:   3:08-cv-5098(GEB-LHG)

Dear Chief Judge Brown:

      Please be advised that this office represents the Defendants, City of New Brunswick, New Brunswick Police Department and Officer Feaster, in connection with the above captioned matter. On February 25, 2010, this office filed a motion for summary judgment (Docket No. 28) in accordance with Judge Goodman's Order of December 3, 2009 (Docket No. 24). Plaintiff's counsel filed opposition to said motion (Docket No. 35) and this office filed a reply to said opposition (Docket No. 37). On March 30, 2010, Plaintiff's counsel filed a sur-reply (Docket No. 38). In accordance with Your Honor's Order of April 14, 2010 (Docket No. 39), please accept the following in response to Plaintiff's sur-reply.

      Local Civil Rule 7.1(d)(6) does not permit sur-reply papers without permission of the Court. Although Plaintiff's sur-reply advises that permission had been obtained for the filing, there is no indication on the Docket that such permission had been granted. As such, any sur-reply submitted without permission may be disregarded in the Court's discretion. See In re Fleet Boston Fin. Corp. Securities Litigation, 253 F.R.D. 315, 326 n.12 (D.N.J. 2008)(Brown) and U.S. SBA v. Herbst, 2009 U.S. Dist. LEXIS 40993 n. 1 (D.N.J. May 14, 2009)(Brown).

      Should the Court consider Plaintiff's sur-reply, it appears that Plaintiff addresses four points, none of which raise a material issue of fact. First, Plaintiff contends that there was no crosswalk present at the intersection of Rte. 18 and Commercial Ave. If this is the case, then Mr. Boswell, crossing Rte. 18, should have yielded to the vehicles traveling on Rte. 18. See e.g. N.J.S.A. 39:4-36(a). Simply, a pedestrian crossing at a point other than a crosswalk is charged with the duty to exercise reasonable care for his own safety commensurate with the risk of such crossing. However, there is ample evidence that a crosswalk did exist at the intersection of Rte. 18 and Commercial Ave: 1) Mr. Martin, Eoon's accident reconstructionist, found that Mr. Boswell did not use a crosswalk

New Brunswick, NJ   •   New York, NY   •   Buffalo, NY   •   Clinton, NJ

Page 2

(See Exhibit "A", Report of Eoon, at p.17); and 2) Plaintiff provided, and actually marked up, Officer Feaster's testimony that there were crosswalks at the intersection of Rte. 18 and Commercial Ave. (See Exhibit B, attached to Plaintiff's sur-reply, deposition of Officer Feaster at T76:1-4). It is noted that N.J.S.A. 39:4-33 requires a pedestrian to utilize an existing crosswalk, which Mr. Boswell did not do[1].

However it is immaterial whether Mr. Boswell crossed at a crosswalk or not. Had Mr. Boswell utilized the crosswalk, when crossing Rte. 18, Plaintiff's counsel cannot seriously contend that the act of utilizing the crosswalk would have protected Mr. Boswell from being struck by the Eoon and Byrnes vehicles. The fact remains that Mr. Boswell crossed Rte. 18 against the traffic light, and walked into oncoming traffic. Whether he was within the crosswalk or not when he crossed Rte. 18 and was struck by the Byrnes and Eoon vehicles was not the cause of this accident

As to the means in which Mr. Boswell could have exited Boyd Park, Plaintiff takes issue with whether a covered walkway or pedestrian bridge existed[2]. It did. At the time of Plaintiff's accident, the Commercial Street/Tabernacle St. pedestrian overpass was still in existence and was, therefore, available for Mr. Boswell to use on September 4, 2005. (See Exhibit "B", Certification and DOT inspection report, Bridge demolished on June 9, 2007). N.J.S.A. 39:4-36.1 requires a pedestrian, crossing a roadway where a pedestrian bridge has been provided, to yield the right of way to all vehicles traveling on that roadway. As such, Mr. Boswell was required to use the pedestrian bridge or if he failed to do so, then yield the right of way to oncoming traffic. Mr. Boswell did neither. Instead, Mr. Boswell exited Boyd Park, crossed three (3) lanes of traffic, crossed the median and then entered the three (3) southbound lanes of travel on Rte. 18 where he was struck by the Eoon and Byrnes vehicles. Based upon his actions, it was Mr. Boswell who chose to cross Rte. 18 and when to cross it. Based upon the sur-reply, Plaintiff either badly misconstrued the specifics of the reply or simply chose to ignore what was stated in the reply. No one can know what made Plaintiff chose to step off the median into the path of oncoming vehicles. Plaintiff would like the Court to believe it was Officer Feaster who told Mr. Boswell to cross Rte. 18 against the traffic light and to walk into the roadway with oncoming traffic. However, Officer Feaster only told Mr. Boswell that he would have to leave the park and with an arm movement directed him to Commercial Ave. (See Exhibit B, attached to Plaintiff's sur-reply, at T90:11-23). Again, since we cannot know Mr. Boswell's thought process that evening as he stood on the median separating the six (6) lanes of Rte. 18, as I set forth in the reply, there are a myriad of reasons, including boredom, for Mr. Boswell's entrance

---

[1] On November 4, 2009, Plaintiff amended with a crosswalk statute, which applies to roadways not controlled by a traffic signal. (See Exhibit "C"). The statute is inapplicable to the facts of the instant matter, as it is undisputed that the intersection of Rte. 18 and Commercial Ave. was controlled by a traffic signal. While Plaintiff, at that time, appears to have believed that crosswalks did exist on Rte. 18, what is more pertinent is that Plaintiff amended with a statute which states: "It shall be unlawful for a pedestrian to cross any highway having roadways separated by a medial barrier, except where provision is made for pedestrian crossing".

[2] Plaintiff's silence in the sur-reply as to the additions to their swim or Rte. 18 theories of egress from Boyd Park seems to now acknowledge that Mr. Boswell could have also exited Boyd Park by using the New Street means of egress.

Page 3

into the Southbound lanes of Rte. 18 at that very moment.  This does not raise a material issue of fact, but what it does, in fact, establish is that it was only Mr. Boswell who had the opportunity and means to make a decision consistent with avoiding harm that may befall anyone stepping into oncoming traffic on a highway.  Further, since no one will ever know how Mr. Boswell arrived at Boyd Park or how long he was there, on that evening or on any other evening, it further establishes that Plaintiff has no material facts to dispute Officer Feaster's version of that evening's interaction between Officer Feaster and Mr. Boswell.  Expert opinions are not facts.  Without more, summary judgment should be granted to the City of New Brunswick, the New Brunswick Police Department[3] and Officer Feaster.

In the sur-reply, Plaintiff has attempted to camouflage a lack of material dispute with vitriolic rhetoric.  Out of an 11 page reply brief, Plaintiff's accusations in the sur-reply, focus on only one paragraph.  Even then, despite all of the inauthentic indignation and untoward remarks, Plaintiff has still failed to provide one issue of material fact.  Plaintiff's abrasiveness should not be permitted to defeat the New Brunswick defendants' motion for summary judgment.

Respectfully submitted,

SUSAN K. O'CONNOR

SO:rk
cc:    Richard Galex, Esq. @ Galex Wolf, LLC [E-FILED (COURTESY COPY TO FOLLOW)]
       Steven Altman, Esq. @ Benedict & Altman [E-FILED (COURTESY COPY TO FOLLOW)]
       Mario C. Colitti, Esq. @ Law Offices of Baumann & Viscomi - Somerset [E-FILED (COURTESY COPY TO FOLLOW)]
       Stephen R. Dumser, Esq. @ Swartz Campbell, LLC [E-FILED (COURTESY COPY TO FOLLOW)]

---

[3] As noted in the reply, Plaintiff has apparently conceded all claims against the New Brunswick Police Department.

Exhibit "A"

LAW OFFICES OF
## BAUMANN, LYNES & VISCOMI

LINDA S. BAUMANN
MARTHA D. LYNES
FRANK A. VISCOMI
DAVID J. EVERETT
THOMAS E. MILLER••
KAREN QUINN SOPKO
ROBERT McGRATH
MARIO C. COLITTI••
DENISE FOLIO TUNNEY•

399 CAMPUS DRIVE
SUITE 301
P.O. BOX 6782
SOMERSET, NEW JERSEY 08875-6782

(732)563-6830

SUSAN M. PIERCE
JUDITH E. COLLINS•
TEJAL FORRAR
AMANDA M. LEHMAN
ANTHONY J. BROWN
PATRICIA R. LYONS
DONNA M. HAWLEY•
GREGORY G. GLEASON

•CERTIFIED BY THE SUPREME
COURT OF NEW JERSEY AS A CIVIL
TRIAL ATTORNEY
••CERTIFIED BY THE SUPREME
COURT OF NEW JERSEY AS A
WORKERS' COMPENSATION
ATTORNEY
•MEMBER OF NJ AND PA BARS

FACSIMILE:
(732) 563-0716 (Litigation)
(732) 868-7187 (Worker's Comp)
(732) 805-0498 (PIP)

November 24, 2009

Via Facsimile & Regular Mail (732) 257-5654

Richard Galex, Esq.
Galex, Wolf, L.L.C.
1520 U.S. Highway 130
Suite 101
North Brunswick, NJ 08902

        Re:  Boswell, Michael v. Eoon, Steve W., et al.
             File No:  LA359-006329297-0002
             Docket No: MID-L-7570-07

Dear Mr. Galex:

    Pursuant to Fed. R. Civ. P. 26(b), defendant Steve Eoon amends
his initial disclosures to include the attached expert report of
William J. Martin, ACTAR, National Forensic Consultants, Inc., 8500
Remington Avenue, Pennsauken, New Jersey 08110, dated October 29,
2009.  Mr. Martin may be called as an expert witness at the time of
trial.

    Thank you.

                        Very truly yours,

                        C. Colitti

                        Mario C. Colitti
                        mario.colitti@libertymutual.com
                        Direct Fax: (603) 334-7583

MCC / hlf
Enclosure
cc:  Steve Dumser, Esq. (856)727-0464
     Craig Corson, Esq. (732)545-4579
     Steve Altman, Esq. (732) 214-1897
     Hon. Lois Goodman, U.S.M.J.
     Robin Knox, Marlton Claims

BO-OAT-28



# NATIONAL FORENSIC CONSULTANTS, INC.™

October 29, 2009

**CORPORATE OFFICE**

8500 REMINGTON AVENUE
SUITE D.
PENNSAUKEN, NJ 08110
PHONE: (856) 662-6500
FAX: (856) 662-6590

NFC OF NORTH CAROLINA, INC.™
NFC OF CENTRAL FLORIDA, INC.™

NATIONAL PHONE NUMBER
800-738-7620

NATIONAL FAX NUMBER
800-391-6275

INTERNET ADDRESS
www.nfcexperts.com

**SERVICES PROVIDED**
Accident Reconstruction
Blasting & Vibration
Construction Defect
Economic Loss
Environmental
Evidence Management & Storage
Fire Origin & Cause
Geotechnical
Litigation Support
Product & General Liability
Property

"And many more services."

Over 400 Consultants available
Nationwide for all of your
Forensic needs

Mario C. Colitti, Esquire
**Baumann, Lynes & Viscomi**
399 Campus Drive, Suite 301
Somerset, NJ 08873

Subject:  *Boswell v. Eoon, et als.*
D/O/L:    09/04/2005
Your File: 6329297-02
NFC File: NJ-26661-ARP

Dear Mr. Colitti:

At your request, I have conducted an evaluation and analysis of the circumstances surrounding the above captioned loss. For this evaluation I have reviewed the following case specific documentation:

- New Jersey Police Accident Report numbered 05-17438
- Forty-five (45) Police scene photographs
- Five (5) daytime photographs of the accident location
- Transcript of the recorded interview of Joy Simmons
- Transcript of the deposition of Steven Eoon
- Transcript of the deposition of Kirsten Byrnes
- Transcript of the deposition of Christina Eickman
- Transcript of the deposition of Joy Allen (nee Simmons)
- Report of Nicholas Bellizzi, P.E. for the plaintiffs
- Report of Walter Suhaka for defendants, Byrnes and Eickman

Following is the report of my findings in this evaluation. Also enclosed is an aerial photograph dated April 1, 2002 (from terraserver.com) that shows the general layout of the median islands at the intersection and southbound roadway as they are shown in the provided scene and site photographs.

Mario C. Colitti, Esquire                                          October 29, 2009
**Baumann, Lynes & Viscomi**                                    NFC File: NJ-26661-ARP
                                       Page 2


## Police Investigation

New Jersey Police accident Report numbered 05-17438, from the New Brunswick Police Department, reports that this crash occurred on Sunday, September 4, 2005 at approximately 2:16 A.M. on southbound Route 18 at the Commerce Avenue intersection.

The involved units are listed as follows:

- Unit #1: A 2000 Volkswagen GTI, silver, NJ registration: SCN30Y, VIN: WVWDC21JXYW465129, owned and operated by Steve W. Eoon of East Brunswick, NJ.

- Unit #2: A 2001 Honda Civic, blue, NJ registration: RTT38A, VIN: 1HGEM22951L066272, owned by Christina M. Eickman of Harrison, NJ and operated by Kirsten M. Byrnes, of Harrison, NJ.

- Unit #3: A pedestrian, Michael Boswell, 46 years of age, no address given.

The police report is listed as 26 pages (however, pages 8 through 12 are not included) providing the following data:

The ambient conditions are listed as darkness with streetlights lit, clear weather and dry roadway. On page #13 the report states, "A streetlight is erected eighty-seven feet north of the intersection."

Route 18, at the crash location, is listed as straight and level, with a concrete surface. Southbound Route 18 is reported to consist of three lanes. The right lane is 10 feet wide, the center lane is 12 feet wide and the left lane is 11 feet wide.

In synopsis, it is reported that Mr. Boswell was crossing southbound Route 18 from standing in the center median island, on the south side of the intersection of Commerce Avenue. Unit #1 was southbound in the left lane with a green signal and struck the pedestrian on the right front, knocking him into the center lane where he was subsequently run over by Unit #2, which was southbound in the center lane with a green signal. A witness vehicle, operated by Joy (Simmons)

Mario C. Colitti, Esquire                                              October 29, 2009
**Baumann, Lynes & Viscomi**                                    NFC File: NJ-26661-ARP

Page 3

Allen, was ahead of Unit #2 in the center lane with a green signal and veered into the right lane and
stopped by the Exxon station.

Mr. Boswell was wearing dark colored clothing, a red baseball cap and red sneakers.

There is 44 feet from the southbound beginning of the old grass median to the start of the guardrail.

The handwritten statement of Steve Eoon reads: *I was enroute from work traveling down Route 18
to East Brunswick, when I was approaching Commercial Avenue.  As I was approaching the
intersection, traffic light was green.  Traffic is light.  I was startled to see a shadow or object in
front of my car.  I tried to avoid him by turning to the left but I cannot turn too much because of
construction barriers on the left.  I hit him.  I slammed on my brakes and came to a stop.  After I
stop to check out what happened, looking for what I hit, saw car next to me had stopped in front of
me, saw a man pinned under the car in front of me. . .  The speed I was traveling was between 40-
50 mph and I was traveling on the left lane, visibility was clear but dark on the left.*

The handwritten statement of Samantha Eoon reads: *Going home from work on Route 18 South, I
was sitting on the passenger side of my husband's vehicle, as we were approaching the intersection
of Route 18 and Commercial Avenue, the traffic light was green, as we were passing the
intersection, I saw a shadow or a figure flashing in front of our car, Steve, my husband was trying
to steer clear of the object, turning his wheel to the left but was not successful, next thing I knew, I
heard a thump and the windshield in front of me came crashing in.  Steve slammed on the brake
and we came to a stop, he got out of the car and I followed, I then realized there was a car in front
of us on the right, with a person pinned under it.*

The handwritten statement of Kirsten Byrne reads: *We had arrived at The Den just prior to 10 p.m.
on Saturday Sept. 3.  I was the designated driver for the evening.  We (Christine Eickman, Kelly
Bramwell and myself) left The Den prior to closing and went to eat at PJ's in New Brunswick
slightly before 2 a.m.  After eating in the car we departed and made out way to Route 18
(approximately 2:10 a.m.).  I cannot remember clearly how fast I was going but no faster than
highway speed as I approached the Commercial Avenue intersection.  The light was green and I
was in the center lane.  The cars in the left and right hand lanes were braking.  The car to the left
was in his lane but favoring mine so I began braking and favoring my right, though still remaining*

Mario C. Colitti, Esquire
Baumann, Lynes & Viscomi

October 29, 2009
NFC File: NJ-26661-ARP

Page 4

*in my lane. As I was pulling close to the two cars, I noticed a man lying in the street. I attempted to stop but I could not avoid running him over. He was dragged by the car, stuck underneath until I could bring it to a complete stop. . .*

The handwritten statement of the witness, Joy Simmons reads: *I was traveling on Route 18 southbound. I had just merged on via the last entrance before Commercial Avenue. I moved into the middle lane headed toward the Commercial Avenue intersection at about 50 mph. The light was green. I noticed what looked like a figure standing inside the median on the other side of the light and said to myself "He can't about to cross" as there was a car ahead of me in the left lane. Suddenly the man seemed to just pop out into the highway and the first car struck him. The man flew up in the air and landed in the middle lane. I don't remember how but someway I ended up in the right most lane. After the man hit the ground he rolled and I saw the second car about to run him over and said to myself "please stop," but the second car could not in time and ran over him, braking in the process. I saw this part from the driver's side window. The second to hit was in the middle lane and I was a little ahead but parallel in the right most lane. I immediately pulled over near the Exxon station to pray and see if I could help.*

## Site/Scene

An inspection of the crash site was not conducted. It is reported that the intersection of Route 18 and Commercial Avenue was under construction at the time of this crash, as shown in the police photographs and the daytime photographs provided, and it has since been drastically changed, eliminating the intersection altogether. Two aerial photographs of the intersection are attached - one from 2002 to show the original layout and one from 2007 to show how much it had changed by 2007.

The daytime site photographs show that north of the intersection of Commerce Avenue, there was an approximately 2.5 to 3 foot high Jersey barrier at the left edge of the left southbound lane with vertical glare prevention vanes on top of the barrier and an approximately 15 foot section of guardrail at the end of the barrier. The guardrail ends a short distance north of the south end of the median island. On the south side of the intersection, as noted by the police report, the guardrail again begins 44 feet south of the north end of the median island. The north end of the guardrail has a reflector plate facing southbound traffic. Using the aerial and daytime photographs, the median island appears to be approximately 30 feet wide.

Mario C. Colitti, Esquire                                          October 29, 2009
**Baumann, Lynes & Viscomi**                              NFC File: NJ-26661-ARP
                                    Page 5

The photographs show that there are traffic signal poles near the ends of the median islands north and
south of the intersection, with streetlights atop of the traffic signals. However, the only streetlight noted
in the police report is listed as 87 feet north of the intersection and based on the photographs, is
assumed to be the streetlight on the west curb, north of the intersection.  The police photographs do
show the streetlight on the west side of Route 18, north of the intersection, and the streetlight atop of
the traffic signal on the center median, north of the intersection, to be illuminated.  However, the
streetlight atop the traffic signal on the center median on the south side of the intersection is not
illuminated in the police photographs.

The police report lists the roadway as straight and level. However, the aerial photographs show that
Route 18 begins a large radius arc to the east at the north side of this intersection, an arc that continues
well to the south.

The police report indicates and the photographs show many orange and white reflective construction
barrels around the ends of the center median islands on both sides of this intersection. The police
photographs also show the raised Jersey barrier that takes the left 2 feet of the left southbound lane, a
barrier that, according to the police report, begins 44 feet south of the north end of the median island.

The police scene photographs show the Eoon Volkswagen stopped in the left lane by the Jersey barrier,
an unknown distance past the north end of the guardrail. The Byrnes Honda is stopped further south, in
the center lane and partially into the left lane, on an angle to the left.  Mr. Boswells' red baseball cap is
laying on the yellow line at the left edge of the left lane, north of the north end of the guardrail, in the
area where the southbound roadway is bordered on the left by only the median island, not a barrier.

The police photographs show the initial contact damage on the Eoon Volkswagen to be on the top of
the right front fender, approximately a foot rearward of the headlight.  The remaining contact marks are
shown to be on the right edge of the windshield and of the top of the right "A" pillar and roof, just
above the windshield. There are no marks or damage on the bumper area of the Volkswagen or
anywhere on the front of the Volkswagen.

Mario C. Colitti, Esquire                                              October 29, 2009
**Baumann, Lynes & Viscomi**                                   NFC File: NJ-26661-ARP

Page 6

## Review of Statements and Depositions

In her recorded interview, Joy Simmons provided the following information, which is summarized: She
saw the pedestrian briefly but barely. The person just kind of jumped out of the median, he didn't get
far. They (the cars) had the green light. The car in the left lane hit him. He went up in the air, hit the
ground and rolled over. Then a car behind her in the middle lane tried to stop but ended up running
him over. This happened through the intersection. She was in the middle lane then got into the third
(right) lane. The vehicles were probably going around 50 mph.

### Deposition of Kirsten Byrnes:

> **Page 35 -** She thinks she got onto Route 18 from George Street. She comments that they have
> done major construction and it is not an intersection anymore but there used to be an intersection.
> As she was pulling toward the intersection, she saw two cars that were braking.
> **Page 36 -** She remembers thinking there was an accident or something and the car on her right
> swerved. She was in the center lane, there was a car in the left lane and they were braking. There
> was a car in the right lane that had just swerved a little bit so she was slowing down. As she
> pulled into the intersection there was a man on the road so she slammed on the brakes,
> unfortunately not in time and he was pinned under her car.
> **Page 37 -** Regarding how fast she was going as she was approaching the intersection, because she
> had just got onto the highway, she was going slower than highway speed but accelerating a little
> bit.
> **Page 38 -** As she pulled onto Route 18 she started to accelerate, then she saw the two cars in front
> of her braking so she was braking as she was coming toward them. She does not recall how fast
> she was going at that time. She believes the speed limit is 45 MPH. She agrees that she said she
> first saw the light when she was about 30 yards back but that is a guesstimate. Regarding what
> she saw first, the light or the braking cars, she saw the light first because it was green. Traffic
> flow was minimal, there were only the two cars in front of her that she knows of.
> **Page 39 -** It was kind of simultaneous that she saw the light and the cars braking.
> **Page 40 -** She did not see anything in the road until she was virtually on top of the body that was
> laying, thrown, in the road. She did not see the impact of the first car with the man that was
> laying in the road.
> **Page 41 -** The police diagram fairly well describes the accident scene.

Mario C. Colitti, Esquire
Baumann, Lynes & Viscomi

October 29, 2009
NFC File: NJ-26661-ARP

Page 7

**Page 42** - She doesn't recall her car being as diagonal as it is shown but that doesn't necessarily mean it wasn't.

**Page 43** - She did not see the man get thrown to the ground. She saw him on the ground once she was virtually upon him. From the point of impact until her vehicle stopped was not quite instantaneous. But, because she saw him on the ground she slammed on the brakes, so it wasn't that far that he was dragged.

**Page 44** - She applied the brakes as soon as she saw him. She saw him a couple of feet to a couple of yards from her car. She felt the car hit him and then the car stopped.

**Page 46** - She saw the Eoon vehicle braking as she pulled up to the incident. She did not see any part of the accident with that vehicle. She remembers seeing the vehicle on her right swerve a little, so she thinks her assumption at that point was that there was contact or something, she doesn't know what.

**Page 47** - She does not know what her speed was at that point. Her speedometer was not her concentration point. Once the accident occurred, she slammed it into park. They got out of the car.

**Page 50** - She thinks the lighting was poor at that area.

**Deposition of Christina Eickman:**

**Page 18** - She just remembers looking in front of them and saying or thinking "Oh God, it's a man" and before she knew it they were on top of him. And that was in split seconds. She just looked and he was in front of the car. She doesn't know if Kirsten had already slammed on the brakes, it was so quick.

**Page 19** - They were definitely already into the intersection when she made the first perception and comment. They were just about to hit him. She does not remember seeing him before that.

**Page 21** - She did not see any person in the road walking before what she saw of the man on the ground.

**Page 22** - After they stopped and were out of the car she noticed there was a car to the left of them just sitting there, before that she doesn't remember noticing that car. Looking at the police diagram she thinks it is accurate. She is not sure where on their car the contact was.

**Page 23** - Regarding the point on the roadway where the impact occurred, it was past the light but not that far past. It was her feeling that he was just past the light.

Mario C. Colitti, Esquire                                        October 29, 2009
Baumann, Lynes & Viscomi                                NFC File: NJ-26661-ARP

Page 8

**Deposition of Steve Eoon:**

**Page 30 -** He was driving, his wife was the passenger in the right front.

**Page 31 -** He was driving southbound, going toward New Brunswick. He was approaching Commercial Avenue. He saw an object, like a dark object, in the middle of the road. He tried to avoid it, he tried to slam on the brakes but he couldn't stop in time and he hit it.

**Page 32 -** After that he got out of the car and saw the body pinned underneath the car from the side. The police diagram represents what happened.

**Page 33 -** He was entering the Commercial Avenue intersection when he saw the object.

**Page 34 -** When he first saw the pedestrian, the pedestrian was more toward the left, toward the median. He did not see the object at any point prior to that.

**Page 36 -** His speed was under 50, at 45 to 46 MPH. He thinks the speed limit was 45 MPH. When he first saw the object it was close to his car. Traffic was light.

**Page 37 -** He was in the left lane. From when he saw the guy until impact was seconds. He could not give a number of seconds, all he knows is it happened fast. His wife did notice the object, she did say watch out, they were very close. He doesn't think she saw him before he did.

**Page 44 -** He is familiar with the route, having taken it quite often. When he first saw the object, it was moving.

**Page 45 -** In that the split second between the time he saw the man and the impact, he got the impression the man was moving from right to left.

**Page 47 -** There was no traffic in front of him. As he approached the intersection, the traffic light was green. It was green at all times that he was able to see it.

**Page 48 -** He could see it from several hundred feet back and it was green the whole time. There was no traffic in front of him the entire time. Regarding any traffic behind him or beside him, he could see traffic behind him in his mirror. He couldn't say how many vehicles there were.

**Page 49 -** The nearest vehicle was, maybe 3 or 4 car lengths back, over in the next lane to his right.

**Page 50 -** That vehicle was doing about the same speed as him. There was nothing unusual about that vehicle. Before the impact he tried to swerve to the left but wasn't enough time. After the impact he was still steering a little to the left.

**Page 51 -** The initial impact was on the right front fender. He thinks it was on the corner as opposed to the side or the front. There was a second impact with the windshield.

Mario C. Colitti, Esquire                                      October 29, 2009
**Baumann, Lynes & Viscomi**                            NFC File: NJ-26661-ARP

Page 9

**Page 52 -** The windshield didn't break. He could see that it was a pedestrian when it hit the windshield. After the impact the pedestrian went into the middle lane. When he first saw the object, in addition to swerving he braked and braked hard.

**Page 53 -** He came to a stop after the impact. He doesn't recall how soon the police arrived. His car was still in the same place that it came to a stop when the police arrived.

**Page 55 -** When he came to a stop his car was out of the intersection, because he was looking toward the Exxon station.

**Page 56 -** He can't say how far past the intersection he was.

**Page 57 -** He believes the car that went over the top of the pedestrian is the same one he saw in the mirror.

**Page 59 -** He did not see the other car moved at all before the police got there.

**Page 61 -** The weather was clear. There were street lights. He doesn't know where they were located. Regarding whether he would describe it as well lit, poorly lit or in between, it was well lit. He has been through the intersection recently in the last month, at night and it is very well lit now.

**Page 62 -** It was not as well lit then as it is now. He saw the object the same time his wife said "watch it."

**Deposition of Joy Allen (nee Simmons):**

**Page 19 -** She was driving a Ford Escort, traveling southbound on Route 18 and it was pretty empty.

**Page 20 -** She was in the middle of the 3 southbound lanes.

**Page 21 -** She does not remember anyone next to her on the right side. Regarding the vehicle on the left side, her recollection is that once the light changed she remembers someone passing her on the left. Regarding what light she is referring to, the light at Commercial Avenue changed from red to green.

**Page 22 -** When she approached the intersection. She had a red light. At some point the light turned green. Regarding how far from the intersection she was when the light turned green, there was a vehicle in front of her, in the middle lane. She was not the first one. She was stopped at the intersection. She doesn't remember if there were any vehicles to her left when she was stopped there. She doesn't think there were any vehicles on her right.

Mario C. Colitti, Esquire                                                    October 29, 2009
**Baumann, Lynes & Viscomi**                                          NFC File: NJ-26661-ARP

Page 10

**Page 23 –** She doesn't know if there were any vehicles behind her.  Regarding if she saw Mr.
Boswell when she was stopped, she is not sure if it was when she was stopped or when the light
changed.  Maybe she was stopped.  She saw him within the period of the light changing.  He was
near the intersection from the northbound side.  There is a median between the north and
southbound sides.  He was right up against the median.  When she saw him, he was moving.  He
was crossing the highway and was about to cross the southbound lanes.

**Page 24 -** He was wearing something dark.  When the light turned green she remembers seeing
him and he was still going and she remembers a car passing her on the left side.  He got hit, she
believes he went up in the air and landed in the middle lane.  At some point she got over to the
right lane.  The car in front of her made it through the light.  She does not have any recollection
of a car behind her.  When the light turned green she started to go forward but saw it happen and
got over to get away from it.  Then she saw another car run over him so she guesses it was a car
behind her and then she pulled over.  Her vehicle made it completely into the right lane.

**Page 26 -** When she came to a stop she was across the intersection.

**Page 27 -** At the time the first vehicle hit him she was in the center lane and her vehicle had not
made it into the intersection.  She believes she got over before she crossed the intersection.  At
that time she was about to cross the intersection and the car in the left lane had already crossed
the intersection.

**Page 28 -** She estimates that they were about a car length apart.  She brought her vehicle to a stop
by the Exxon Station.

**Page 29 -** When the second car came in contact with Mr. Boswell, she was completely in the
right lane and completely through the intersection.  She was looking out the window and saw him
run over.

**Page 31 -** A police officer did speak with her.  She believes that what she just testified to should
be consistent with what she told the police officer at the scene.  The police officer did ask her for
a written statement.  That was about an hour later, while she was still at the scene.

**Page 32 - She is shown the handwritten statement that she made to the police.**  After reading
the statement she said that she remembers slowing down or stopping at some point.  But, if she
said the light was green on the statement it was green.

**Page 33 -** Regarding if she has a specific recollection of the light at Commercial Avenue being
red, for some reason she remembers slowing down or stopping.  But, she also guesses the light
didn't have to be red.  She remembers slowing down but she doesn't remember the light being
red.

Mario C. Colitti, Esquire                                    October 29, 2009
**Baumann, Lynes & Viscomi**                          NFC File: NJ-26661-ARP

Page 11

**Page 43 -** Regarding specifically where the pedestrian was standing, he actually looked like he was in the concrete median. He climbed over it. When she saw him, he was on the northbound side of the median, like right up against it and then he came over it. That would have been as she was driving.

**Page 45 -** Regarding how much time passed from when she first observed the person to the point at which she saw him being hit was quick, five to ten seconds.

**Page 46 -** The time from when she first saw him come out of the median until he got hit was immediate. The time between the first car and the second car was a few seconds. Regarding a time frame of immediate, as soon as he came out of the median it happened, so she would say it was almost no time.

**Page 47 -** She estimates from the first hit to the second hit was maybe 5 to 10 seconds.

**Page 48 -** She moved to the right lane as soon as she saw the first car strike him. She agrees she was moving to the right as she was observing the accident.

**Page 51 -** Regarding how dark the road was, there were street lights on Route 18.

**Page 52 -** She could not tell what he was wearing. When she saw him on the median, it wasn't very clear, like a figure she was seeing. She assumes it was dark colors because she doesn't recall seeing anything bright. From where she was she could see a figure, she couldn't see anything exact.

**Page 53 -** She does not know how wide the median is where he was standing. She estimates that the median was waist high. It was just high enough that he couldn't just step over it.

**Page 55 -** She considers the written statement that she gave to the police as accurate.

**Page 56 -** Regarding in her statement to the police where she said "And I said to myself he can't be about to cross as there was a car ahead of me in the left lane" refers to the car that she was talking about earlier passing her and that is the car that hit Mr. Boswell.

**Page 57 -** Regarding the man having just popped out onto the highway, he was on one side of the median and all of a sudden he was on the other side.

**Page 58 -** She agrees that he walked onto the highway. She doesn't believe she lost sight of him at any time. There was nothing obstructing her view that she can remember.

**Page 59 -** Her speed was approximately 50 MPH. The speed of the vehicle on her left was faster than her because that vehicle passed her.

**Page 69 - She read her recorded interview.** She did not see the car in the left lane apply its brakes at any time. She did not see it try and avoid a collision. She did not see it swerve. She guesses the second car was behind her in the middle lane.

**Page 70** - She saw the second car run over him.  The impact on the first car was the front but she couldn't say what part of the front.  When she made those observations, she was still driving her vehicle.

**Page 71** - She observed the first car hit him through the windshield, then she saw the second car run over him through her left side window.

**Page 72** - When she saw the second impact she had turned her head, she was still driving, she was in the right lane at that time.

**Page 73** - She doesn't know how long the light was green.

**Page 77** - The accident occurred beyond the intersection going south.

**Page 78** - She does not recall seeing any orange barrels or construction barriers on the left side of Route 18 heading south.  She guesses that her speed was something less than 50 MPH as she was slowing down.  She cannot estimate what her speed was.

**Page 80** - She was in the middle lane the entire time before the impact occurred.  There was nothing the first car could have done to avoid the pedestrian.

**Page 81** - She did not have any alcoholic beverage to drink that night, nor anything else that would have impaired her ability to operate a vehicle.

## Discussion and Analysis

The damage on the Eoon Volkswagen is on the right front fender, right "A" pillar, right windshield edge and the roof right at the top of the pillar.  The damage pattern indicates that at the time of impact the pedestrian was moving from west to east - right to left - across the path of the Volkswagen.  Based on the statements and testimony, it appears that Mr. Boswell had crossed in front of the Volkswagen and with the slight steering maneuver of Mr. Eoon, was actually clear of that vehicle when he appears to have made a sudden attempt to go back to the east, directly into the right front fender of the Volkswagen as it was going past him.

At the time of this crash, the police photographs clearly reveal that the area of the median on the south side of Commercial Avenue was not lighted and was very dark.  The general area of the intersection may have been lighted but the immediate area when Mr. Boswell was crossing was not.  Additionally, with the reflective barrels and the reflective end of the guardrail, a guardrail that was narrowing his lane from the left as he left the intersection, there was considerable visual clutter to Mr. Eoon.  Mr. Boswell, dressed in dark clothing - and at night red is dark, presented essentially zero contrast to his

background surroundings while crossing the median island, providing zero conspicuity for approaching vehicle operators.

Based on the location of Mr. Boswell's hat and the testimony of Ms. Allen, it is apparent that Mr. Boswell was crossing in the area of the island on the south side of the intersection but north of where the guardrail begins, which is noted by the police to be 44 feet south of the north end of the median island.

Approaching the intersection, Mr. Eoon was traveling in the left lane, directly beside the Jersey barrier with the glare vanes atop. With the vanes on top of the barrier and the curve of the roadway in the intersection, his view of the center median on the south side of the intersection was very restricted until he was about at the intersection. Then with no lighting in the area where Mr. Boswell was crossing the approximately 30 foot wide median, the pedestrian would not have been visible to Mr. Eoon before the pedestrian reached the southbound roadway.

It is apparent that due to her distance behind the Eoon vehicle and offset to the right in the next lane, with the angle of view of the pedestrian different than the angle of view of Mr. Eoon, that Ms. Allen (Simmons) was able to pick up some kind of movement in the area of the west edge of the center median island that caused her to brake and swerve to the right at the time that Mr. Boswell "popped out" into the southbound roadway.

Ms. Allen saw the pedestrian travel to the west from the median island into the southbound lanes. She described his movement as walking into the highway. However, the physical evidence reveals that Mr. Boswell was starting to move from west to east at the time of contact by the Eoon Volkswagen. He either turned around or just stepped back.

It can be assumed that Mr. Boswell traveled approximately 8 to 10 feet from the edge of the median island, then, for whatever reason, abruptly stepped back to the east. A normal (85th percentile) walk speed for an adult male of the age group of 40 to 50 years of age is approximately 5.7 to 5.8 fps. This reveals that Mr. Boswell was on the southbound roadway for approximately 1.5 to 1.7 seconds to the time of impact, if a walk speed of 5.7 to 5.8 fps is assumed. Even if a walk speed of 5 fps (50th percentile) is used, the timeframe is still 2 seconds or less.

Mario C. Colitti, Esquire                                                October 29, 2009
Baumann, Lynes & Viscomi                                           NFC File: NJ-26661-ARP
                                    Page 14

Based on published studies, a numerical value for the normal base perception/reaction time for a vehicle operator to an unexpected hazard of 1.6 seconds has been used in the Accident Reconstruction community. However, this is oversimplified and applies mainly to vehicle intrusion crashes. Based on current training and studies, this writer uses a timeframe of 1.6 to 2.0 seconds for normal perception/reaction time to a vehicle encroachment scenario.

Pedestrian encroachment in darkness is a totally different occurrence. The pedestrian, clad in dark clothing as Mr. Boswell was, provides no conspicuity (reflectivity of contrast to their background) until they are at least partially illuminated by the vehicle's headlights sufficient to recognize that they are a pedestrian.

Thus, the timeframe and physical evidence reveals that Mr. Eoon apparently perceived the movement of the pedestrian ahead crossing the path of his vehicle from left to right. He reacted by braking and swerving a little to the left and apparently would have not have contacted the pedestrian had Mr. Boswell not abruptly changed direction back to the east, directly into the right front side of the Eoon Volkswagen as it was going by. This last movement back to the east is the movement Mr. Eoon remembers, causing his insistence that the pedestrian was crossing from west to east.

Mr. Eoon could not have swerved to the left more than a foot or two because he was rapidly approaching the area where the end of the guardrail and barrier narrows his left on the left side and he had to remain aware of his location in relation to that obstacle.

Conversely, all of the southbound vehicles were traveling with their headlights on, headlights that would have been clearly visible to Mr. Boswell even when he was still on the center median island.

The contact onto the windshield with the upper body and head of the pedestrian, while his body was still to the right side of the Volkswagen, caused the pedestrian to be projected to the west when he came to rest in the center lane where he was subsequently run over by the Byrnes Honda.

At a speed of 45 MPH (66 fps) and based on a 1.6 to 2 seconds perception/reaction time for Mr. Eoon, which would indicate that his braking and steering attempt would have been just before the point of contact, the Eoon Volkswagen was approximately 100 to 130 feet away from Mr. Boswell when he stepped from the median island.

Mario C. Colitti, Esquire                                    October 29, 2009
**Baumann, Lynes & Viscomi**                        NFC File: NJ-26661-ARP

Page 15

From a speed of 45 MPH, total stopping distance (including 1.6 to 2.0 seconds for perception/reaction time) is approximately 200 to 228 feet in 4.5 to 5.0 seconds. This reveals that with the pedestrian into the roadway as a hazard to Mr. Eoon for approximately 2 seconds, when Mr. Boswell stepped into the southbound lanes, presenting himself as a hazard to Mr. Eoon, his Volkswagen was so close that he could not stop prior to reaching the pedestrian.

New Jersey Motor Vehicle and Traffic Laws (2005):

**§39:4-36. Driver to yield to pedestrian at crosswalk, exceptions.**

The driver of a vehicle shall yield the right-of-way to a pedestrian crossing the roadway within a marked crosswalk or within any unmarked crosswalk at an intersection, except at crosswalks when the movement of traffic is being regulated by police officers or traffic control signals or where otherwise prohibited by municipal, county or State regulation and except where a pedestrian tunnel or overhead pedestrian crossing has been provided but **no pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield. Nothing contained herein shall relieve a pedestrian from using due care for his safety.**

Whenever any vehicle is stopped to permit a pedestrian to cross the roadway, the driver of any other vehicle approaching from the rear shall not overtake and pass such stopped vehicle.

Every pedestrian upon a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway.

Nothing contained herein shall relieve a driver from the duty to exercise due care for the safety of any pedestrian upon a roadway

In her deposition, Ms. Allen mistakenly remembers the center median as a Jersey barrier type median, as it apparently was at later times. She also testified initially that she was stopped and the Eoon vehicle passed her but her later testimony is that the statement made to the police was accurate and the Eoon vehicle was ahead of her.

Mario C. Colitti, Esquire                                                   October 29, 2009
**Baumann, Lynes & Viscomi**                                      NFC File: NJ-26661-ARP
                                           Page 16

Mr. Bellizzi describes the locus as being divided by a Jersey barrier median, even though the police scene photographs and available daytime site photographs show that the median was a wide island, an island that is shown by the 2002 aerial photograph to be approximately 30 feet wide. Because of this discrepancy, his analysis of the actions of Mr. Boswell is completely off base. With the barrier, with the vanes atop, next to the left lane, Mr. Boswell had no view of the center median, let alone the northbound lanes, until he was at the intersection. He also opined that the area is well lighted when the police scene photographs clearly show that it was not.

Lastly, Mr. Bellizzi uses Ms. Allen's initial testimony that she was stopped at a red light, even though her later testimony, after she was finally given the opportunity to read her prior statements, reveals that she was not stopped and does not remember a red signal.

## Opinions

Based on a reasonable degree of scientific certainty and accident reconstruction experience, it is my opinion that this accident was caused solely by the actions of Mr. Boswell.

He attempted to cross a high speed major arterial roadway against a red traffic signal at a time that there was traffic approaching. He had crossed at least most of the left southbound lane and had cleared the path of Mr. Eoon, who had perceived his presence and was reacting by braking and swerving to the left - away from him, when he abruptly moved to the east, directly into the right front side of Mr. Eoon's Volkswagen. This movement to the east and contact into the right front side of the Volkswagen by Mr. Boswell caused his upper body to strike the windshield and pillar. This partial body contact on a frontal facing portion of the Volkswagen caused Mr. Boswell to be propelled further to the west, ultimately into the center lane, where he was subsequently run over by the Byrnes Honda.

Mr. Boswell was crossing the highway in a darkened area, wearing dark clothing, creating a very low conspicuity to approaching vehicle drivers at a time that the Eoon Volkswagen was too close to be able to avoid reaching the point where Mr. Boswell was crossing.

Conversely, the headlights of the southbound vehicles, vehicles that were too close for him to be able to successfully cross the southbound roadway, were clearly visible to Mr. Boswell. The southbound

Mario C. Colitti, Esquire                                                    October 29, 2009
**Baumann, Lynes & Viscomi**                                          NFC File: NJ-26661-ARP

Page 17

vehicles had the right-of-way with a steady green traffic signal. Mr. Boswell did not cross at a designated crosswalk and **did** suddenly walk out in front of oncoming traffic that was so close that they could not yield to him. As such, Mr. Boswell did not use due care for his own safety.

Therefore, it is also my opinion that this accident was unavoidable to Mr. Eoon for all of the same reasons stated above.

This analysis and report are based on the information and evidentiary documentation listed.  I reserve the right to supplement or amend these findings and/or opinions should viable new evidence become available.  Should you have any questions or comments, please contact me at 856-662-6500.

Very truly yours,

William J. Martin, ACTAR #166
Consultant

/meg

NFC File: NJ-26661-AR

*SITE PHOTOGRAPHS*



NJ·26661                    SITE 2006



NJ·26661         SITE  2002

NFC File: NJ-26661-AR





NFC File: NJ-26661-AR





NFC File: NJ-26661-AR



Exhibit "B"

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
40 Paterson Street, P.O. Box 480
New Brunswick, NJ 08903
(732) 545-4717
Attorneys for Defendants, Ptl. James Feister and city of New Brunswick, City of New Brunswick and
Patrolman James Feister

| | |
|---|---|
| Plaintiff,<br><br>MICHAEL BOSWELL<br><br>     vs.<br><br>Defendants,<br><br>STEVE EOON, KIRSTEN BYRNES, CHRISTINA EICKMAN, PTL. JAMES FESITER, NEW BRUNSWICK POLICE DEPARTMENT, CITY OF NEW BRUNSWICK; and JOHN DOES (#1 thru #5) | SUPERIOR COURT OF NEW JERSEY<br>MIDDLESEX COUNTY<br>LAW DIVISION<br><br>DOCKET NO. 3:08-cv-5098(GEB-LHG)<br><br>CIVIL ACTION<br><br>**AFFIDAVIT** |

STATE OF NEW JERSEY    )

                        )      SS:

COUNTY OF MIDDLESEX COUNTY)

     I, JOANNE SCHUTZ, Supervising Engineer for the New Jersey Department of

Transportation, by way of Affidavit, in accordance with *R. 1:4-4(b)*, says:

     1.     On April 12, 2010, I was contacted by the law office of Hoagland, Longo, Moran,

Dunst and Doukas, LLP for information pertaining to the destruction of the pedestrian bridge

located at Tabernacle Street between Commercial Avenue and New Street on Route 18 in New

Brunswick, NJ.

     2.     Upon receipt of said telephone call, I reviewed the records of the Department of

Transportation and determined that the only pedestrian bridge located in the area of Commercial

Avenue was the Tabernacle Street bridge and that was taken down on June 9, 2007.

     3.     On April 13, 2010, I provided a copy of the inspector's report documenting the

Hoagland, Longo,
Moran, Dunst
& Doukas, LLP
Attorneys at Law

40 Paterson Street
PO Box 480
New Brunswick, NJ

destruction of the pedestrian bridge located at Tabernacle Street and Route 18.   I certify that this is a true and accurate copy of the inspector's report with respect to the destruction of the pedestrian bridge located at Tabernacle Street and Route 18.

I hereby certify, pursuant to *R. 1:4-4(b)*, that the foregoing statements made by me are true.   I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

By: _____
JOANNE SCHUTZ

Dated: 4|19|2010

Sworn to me this _19th_ day of _April_, 2010

_____
NOTARY PUBLIC
**KAREN S. HUTTER**
A Notary Public of New Jersey
My Commission Expires Dec. 20, 2014

Hoagland, Longo,
Moran, Dunst
& Doukas, LLP
Attorneys at Law

40 Paterson Street
PO Box 480
New Brunswick, NJ

**NEW JERSEY DEPARTMENT OF TRANSPORTATION**
**DAILY INSPECTOR'S REPORT**

See Instructions on First and Last Sheets of DC-29 (a) Pad

(i) AS-BUILT QUANTITY

(a) Route __18__   Section __2E__   Description __CLEARING SITE BR. EXIST'G PEDES. BR.__ @ TABERNACLE   Date __12-9-07__

(b) Item No. __1795__   Item __(m)__   Inspected __NACIREMA__   (c) Inspector Worked __8 PM__ to __4 AM__   Man Hours This Item __8__

(c) Inspector's Signature _____

(d) ☐ Contractor  ☑ Subcontractor __NACIREMA__   (k) Contractor Worked __8 PM__ to __4 AM__

| (f) Plan Sheet No. | (g) Location (Station to Station) (Name of Structure) | (h) Offset | (i) Quantity | (j) Concrete Req. | Used | (l) Labor and Equipment | Hrs. |
|---|---|---|---|---|---|---|---|
| | S-1214-152 | | | | | 1- SUPT./OP. (MING) | 8 |
| | ROUTE 18 NB & SB | | | | | 1- OPER | |
| | | | | | | 2- WELDERS | |
| LL52 | TABERNACLE STREET | | 125,000 | | | 1- LABORER | |
| | PEDESTRIAN BR. | | | | | 1- SHEAR HYDRAULIC W/EXCAVATION 650 | |
| | | | | | | 1- BACKHOE | |
| | | | | | | 1- HO UTIL/WELDER RIG | |
| | | | | | | 1- CONTAINER TRK | |

Weather and Air Temperature: P.M. __76° CLOUDY__   A.M. __70 CLEAR__   LIGHT FLURRIES DRIVE FLURRIES

(m) Remarks: __NACIREMA DEMOLISHED EXISTING PED. BR @ TABERNACLE.__
__ROUTE 18 NB/SB CLOSED TEMPORARILY — ASSISTED BY (2) NEW JERSEY__
__STATE TROOPER & (3) NEW BRUNS. POLICE.   (CONT = 2 OPERATORS, 2-__
__SUPERVISORS (1-BACKHOE 1-FE-LOADER).   THIS WORK IS SUBSTANTIALLY)__
__COMPLETE EXCEPT FOR MINOR CLEANUP — PAY 100 %.__

Form DC-29 A  9/93   (n) Use Reverse Side for Additional Remarks, Sketches and Calculations

Exhibit "C"



# GALEX WOLF LLC

**A T T O R N E Y S   A T   L A W**

1520 U.S. Hwy. 130, Suite 101
North Brunswick, NJ 08902
(732) 257-0550  Fax (732) 257-5654
www.galexwolf.com

Richard Galex
Certified by the Supreme Court
of New Jersey as a Civil Trial Attorney
Member NJ, FL, OH, TX, USVI Bars

Andrew R. Wolf
Member NJ Bar

Henry P. Wolfe
Member NJ, NY, MI Bars

Lora B. Glick
Member NJ Bar

Steven B. Portnoff
Of Counsel

Charles N. Miller
Of Counsel

November 4, 2009

**Via Fax Transmission and Regular Mail**

Stephen R. Dumser, Esq.
Gercke & Dumser
1236 Brace Road, Suite E
Cherry Hill, NJ  08034

Steven D. Altman, Esq.
Benedict and Altman
247 Livingston Avenue
New Brunswick, NJ 08901

Mario C. Colitti, Esq.
Sherman & Viscomi
399 Campus Drive, Suite 301
Somerset, N.J.  08875

Craig L. Corson, Esq.
Hoagland, Longo, Moran
Dunst & Doukas, LLP
40 Paterson Street
New Brunswick, NJ  08903

Re:   *Boswell v. City of New Brunswick, et al.*
       *Civil Action No. 3:08-cv-05098*

Dear Counsel:

Please be advised that plaintiffs are amending their answers to interrogatories to include their reference to and reliance on <u>N.J.S.A.</u> 39:4-34 in support of their claims in the above-captioned matter.  A copy of this statute is enclosed for your reference.  Kindly accept the foregoing as if fully certified.

Thank you for your courtesies and consideration in this matter.

Very truly yours,

LORA B. GLICK

LBG/
Enclosure

BN-KETTLE-19

Westlaw.

Effective:[See Text Amendments]

New Jersey Statutes Annotated Currentness
  Title 39. Motor Vehicles and Traffic Regulation
    Subtitle 1. Motor Vehicle and Traffic Laws
      ᴺᴱ Chapter 4. Traffic Regulation
        ᴺᴱ Article 6. Pedestrians
          → 39:4-34. Pedestrians to cross within crosswalk or at right angles; facing traffic; sidewalks

Where traffic is not controlled and directed either by a police officer or a traffic control signal, pedestrians shall cross the roadway within a crosswalk or, in the absence of a crosswalk, and where not otherwise prohibited, at right angles to the roadway. It shall be unlawful for a pedestrian to cross any highway having roadways separated by a medial barrier, except where provision is made for pedestrian crossing. On all highways where there are no sidewalks or paths provided for pedestrian use, pedestrians shall, when practicable, walk only on the extreme left side of the roadway or its shoulder facing approaching traffic.

Where sidewalks are provided it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.

CREDIT(S)

Amended by L.1951, c. 23, p. 74, § 25; L.1970, c. 156, § 1, eff. July 24, 1970; L.1981, c. 220, § 1, eff. July 20, 1981.

HISTORICAL AND STATUTORY NOTES

2002 Main Volume

Source:

L.1928, c. 281, Art. V, § 3, p. 728, amended by L.1930, c. 230, § 2, p. 1033.

LIBRARY REFERENCES

2002 Main Volume

  Automobiles ☞160(4), 217.
  Westlaw Topic No. 48A.
  C.J.S. Motor Vehicles §§ 382, 470.

RESEARCH REFERENCES

2009 Electronic Update

ALR Library

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.